UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Toussaint Shooting Club,

Plaintiff,

v.

General Dynamics Land Systems, Inc.,

Defendant.

Case No. 3:26-cv-2706

MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Toussaint Shooting Club (the "Club") has filed a motion for a preliminary injunction. (Doc. No. 6). Through this motion, the Club seeks an Order effective "through December 27, 2026, or until final judgment, whichever is earlier," enjoining Defendant General Dynamics Land Systems, Inc ("GDLS") from:

> (1) excluding, barring, or denying entry to the Club or its members on the Property for the purpose of hunting waterfowl or maintaining the dikes and dams on the Property; (2) conducting testing or live-fire exercises on the Property, which cannot safely occur while the Club and its members are on the Property exercising those reserved rights; and (3) otherwise interfering with the Club's exercise of its reserved right to hunt waterfowl and maintain the dikes and dams on the Property.

(*Id.* at 21-22). GDLS filed an opposition brief to the Club's motion, (Doc. No. 14), and the Club filed a reply. (Doc. No. 15).

Following this briefing, GDLS filed a motion to file a sur-reply, to which it attached its proposed sur-reply and supporting exhibits. (Doc. Nos. 18 and 18-1). The Club filed a response to

the proposed sur-reply. (Doc. No. 21). I grant the motion to file a sur-reply and consider all of the briefing currently before me in deciding the Club's motion for a preliminary injunction.

## II. BACKGROUND

On February 19, 1885, the Club was founded "as a sportsman's club for hunting ducks, geese, and other migratory game birds, and conserving critical wetland habitat for the same." (Doc. No. 1-2 at 4). Since the time it was founded, and pursuant to its bylaws, the Club admits only eighteen members at one time. (Doc. No. 25 at 77). Those current eighteen members continue the Club's activities to this day.

At or around the time it was founded, the Club owned approximately 2,000 acres of this wetland habitat along the southwestern shore of Lake Erie in Ottawa County, Ohio, on which it conducted its activities. (Doc. No. 1-2 at 4). In 1918, during World War One, the Club conveyed approximately 643 acres of its property to the United States government via warranty deeds. (*Id.* at 20-23). These deeds included the following reservations of rights:

> The Grantor, The Toussaint Shooting Club, excepts and reserves from this conveyance all rights of hunting and trapping muskrats, mink, coon and other and all privileges connected therewith which were reserved by George Young, his heirs and assigns, in his conveyance of said Southwest Quarter of Section Seventeen (17) to N.P. Wadsworth on March 4th, 1887, as appears of record in Volume 38, pages 444 and 446, of the Deed Records of said Ottawa County, said rights and privileges being the same which were saved , excepted and reserved in the conveyance covering said Southwest Quarter of Section (17) made by said N.F. Wadsworth to the Grantor herein, the Toussaint Shooting Club, on March 5th, 1887, as appears of record in Volume 38, 447 and 448, of said Deed Records, to which the record reference is hereby made for full description of the rights and privileges reserved by said George Young and said N.F. Wadsworth, and which are now excepted and reserved from this conveyance by the Grantor herein.
>
> . . .
>
> For the purposes of establishing a bird and game sanctuary upon the premises hereby conveyed, the Grantor reserves the sole and exclusive right of hunting, shooting, and killing thereon geese, ducks, snipe and all other kinds of birds and wild animals, and grantor covenants and agrees for itself, its successors and assigns, that the privileges hereby reserved shall not be enjoyed by the Grantor, its successors or assigns so long as the premises shall be held in reservation for Military

> purposes, except under license from the Commanding Officer in charge of the reservation on said premises.
>
> The Grantee covenants and agrees that it will not permit or authorize the hunting, shooting or killing of geese, ducks, snipe, and all other kinds of birds and wild animals on said premises by person other than the Grantor, its successors or assigns.
>
> For the purposes of constructing and repairing the dam now maintained at Snipe Creek located near the northern end of said premises, also the right of building, repairing and maintaining such small dikes and dams upon other portions of said premises as may be necessary to maintain the ordinary stage of water which the Grantor has theretofore contained upon the premises above described in connection with its other property adjoining the same, the Grantor may enter upon said premises for the purpose above mentioned at such time or times as will be satisfactory to and specified by the Commanding Officer in charge of the reservation.

(*Id.* at 20; *see also id.* at 22-23).[1] The deeds were recorded in Volume 79 of the Ottawa County Records on pages 187 and 278, respectively. (*Id.* at 20-23).

In 1967, the "property was duly declared surplus and assigned to the Administrator of General Services for disposal[.]" (*Id.* at 32). The "property" at issue included not just the parcel that had been conveyed by the Club but all parcels from which the United States:

> acquired its interest . . . through instruments recorded at Volume 123, page 351; Volume 124, page 007; and Volume 79, pages 76, 93, 94, 95, 96, 97, 98, 113, 185, 186, 187, and 270 of the Ottawa County Deed Record.

(*Id.* at 29). To "dispose" of this collective "property," Administrator of General Services conveyed it to Community Improvement Corporation of Ottawa County ("CIC") via quitclaim deed, which provided that the conveyance was:

> SUBJECT TO:
>
>> Any and all existing reservations, leases, licenses, easements and rights, recorded or unrecorded, for mineral, public roads, railroads, pipe lines, drainage, sewer mains and lines, public utilities, and hunting and trapping.

---

[1] The language of the two 1918 deeds differs slightly. Specifically, the October 24, 1918 deed does not reference that the Club maintains the water level "in connection with its other property adjoining the same." (*Compare* Doc. No. 1-2 at 20 *with id.* at 22-23). At this juncture, the version is not relevant, but I note for clarification that I am quoting the August 9, 1918 deed. The 1986 Notice also quotes the August 9, 1918 deed. (*See id.* at 34-35).

(*Id.* at 31). This 1967 deed was recorded in Volume 233 of the Ottawa County Records on page 1045. (*Id.* at 25-33).

Nearly twenty years later, on February 6, 1986, the Club filed a Notice pursuant to Ohio Revised Code Section 5301.51, regarding the 643 acres it had conveyed to the United States in 1918. (*Id.* at 34-35). Specifically, the Club gave "notice . . . that it is the owner of and exercises those rights reserved to it in" the 1918 deeds, identified the volume and page number of those deeds, and restated much of the language of the 1918 deeds describing those rights. (*Id.*). At the time, CIC still owned the land. Thus, the Notice identified the January 3, 1967 deed by volume and page number, named the parties to that deed, and alleged the Club's rights had been reserved via the 1967 deed's "subject to" provision. (*Id.* at 35). This Notice was recorded in Volume 315 of the Ottawa County Record on page 0719. (*Id.* at 34-35).

Since its February 6, 1986 Notice, the land at issue has been conveyed four times and the Club has filed two additional notices. Most recently, GDLS acquired the land on March 4, 2025, via a deed recorded on March 12, 2025. (*Id.* at 52-53; Doc. No. 14-4 at 2).

GDLS is a private corporation "engaged in the defense industry," who, "[a]mong other things, . . . manufactures the Abrams tank and other vehicles for the United States Army." (Doc. No. 14-4). GDLS asserts the 642.743-acre property in question houses "part of its ARES comprehensive ordnance test facility, [which] supports live-fire testing, testing of ground combat military vehicles, secure explosive and weapons storage, and specialized barrel and weapon-component manufacturing." (Doc. No. 14-4 at 3).

To this day, the Club continues to own and hunt on the 1,147 acres it did not convey to the United States in 1918 and that is adjacent to the 643 acres it did convey. Additionally, the Club alleges that between 1918 and the events giving rise to this action, the Club "has continuously,

openly, and notoriously exercised" the rights reserved to it under the 1918 deeds regardless of who owned that land the Club refers to as the "643" by:

> hunting waterfowl, trapping furbearers, maintaining hunting locations and trails, and maintaining the dams and dikes to hold the ordinary stage of water necessary for the marsh habitat at a substantial cost and effort to the Club for over a century, which protects the Property, the Club's adjacent property, and Lake Erie.

(Doc. No. 6-2 at 9-11; *see* Doc. No. ). The Club asserts it "has consistently provided courtesy and safety notice of its presence on the Property to the fee simple owners of the Property without issue since the 1918 deeds" and that "prior owners recognized and did not interfere with the Club's exercise" of those rights. (*Id.* at 10).

This practice did not change after GDLS acquired the 643 in March 2025. "GDLS has admitted that Club members hunted on the property during the 2025-2026 season." (Doc. No. 14-4 at 8). And to maintain the marsh habitat that covers the 643 and the Club's adject 1,147 acres, the Club performed maintenance to the 643 between the 2025 hunting season and the start of the 2026 hunting season. (Doc. No. 25 at 62). Finally, consistent with its previous practice, the Club sent GDLS notice of its intent to hunt on the 643 during the 2026 waterfowl season on or about June 30, 2026. (*See* Doc. No. 22-10 at 2).

But unlike previous years – and previous owners of the 643 – GDLS pushed back in advance of the 2026 hunting season. (*See* Doc. No. 22-8). Relevant here, GDLS notified the Club that it would be conducting munitions testing on days during duck season. (*See* Doc. No. 22-10 at 2). Between September 19 and September 24, 2026, GDLS and GDLS exchanged correspondence, through which the Club maintained it had the right to hunt on the land during waterfowl hunting season and, therefore, "No firing may take place on the Property from 10/17/2026-12/27/2026." (Doc. No. 22-11 at 2; *see also* Doc. Nos. 22-10 & 22-12). Ultimately, on September 24, 2026, GDLS, through counsel, sent the Club a letter asserting "[t]he demands and assertions made in the E-mails are unacceptable to GDLS and not consistent with the parties' respective rights in the

Property." (Doc. No. 22-12 at 3). In this letter, GDLS challenged the validity of the Club's 1918 rights and asserted:

> Given the applicable law to the instruments underlying Club's claimed interest in the Property, GDLS believes that it stands upon good ground to forbid Club from utilizing the Property in any fashion. As such, GDLS will continue to operate testing and live fire exercises at the Property such that club members are expressly advised that they cannot be on Property between the hours of 8:00am - 5:00pm, Monday - Friday, from September 28, 2026 through November 20, 2026. Additionally, following those dates, Club members must not be present on the Property during any future testing dates, and any access must be subject to prior notice and reasonable restrictions.

(*Id.*). Nevertheless, GDLS "reiterate[d] that it remains willing to negotiate reasonable use of the Property, subject to" certain defined conditions. (*Id.* at 4).

This litigation followed. On October 7, 2026, the Club filed its complaint in state court seeking a declaration of the validity of its 1918 rights via claims: (1) to quiet title; (2) for prescriptive easement; and (3) for easement by estoppel. (*See* Doc. No. 1-2 at 1-19). GDLS invoked this Court's diversity jurisdiction to remove this action on October 15, 2026.[2] (Doc. No. 1). Then, on October 16, 2026, the day before the first session of Ohio's short waterfowl hunting season was set to begin, the Club filed a motion for a temporary restraining order and preliminary injunction. (Doc. No. 6).

The Club and GDLS were able to reach an agreement that allowed the Club to hunt on the 643 during the first session of the hunting season. (*See* Doc. Nos. 8, 9, and 10). Remaining at issue

---

[2] Based on the allegations in the Club's complaint and GDLS's notice of removal, which the Club does not dispute, I conclude the Court's diversity jurisdiction was properly invoked. (*See* Doc. No. 1 at 2-5; Doc. No. 1-2 at 1-19). *See also* 28 U.S.C. § 1332. I agree that, under the law, the Club is a citizen of Ohio and GDLS is a citizen of Delaware and Michigan. (Doc. No. 1 at 3 (citing Doc. No. 1-2 at 3)). *See* also 28 U.S.C. § 1332(c). Therefore, complete diversity of citizenship exists. 28 U.S.C. § 1332(a). Further, I do not question, and the Club does not dispute GDLS's assertion that the value of the declaratory and injunctive relief sought by the Club exceeds $75,000. (Doc. No. 1 at 3-5). Therefore, the amount-in-controversy requirement is met. *See* 28 U.S.C. §§ 1332(A), 1446(c)(2); *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court.").

is the second session of Ohio's 2026 waterfowl hunting season, which runs "from November 14, 2026, through December 27, 2026" during the hours of "one half hour before sunrise to sunset." Ohio Admin. Code § 1501:31-7-06(A)(1)-(2).

Notably, GDLS does not seek to prohibit the Club and its members from the 643 altogether this hunting season. Instead, it seeks to bar the Club's members from accessing the 643 only "from 8 a.m. to 5 p.m., daily except Saturdays, Sundays, and holidays" – the hours GDLS is legally allowed to conduct the "Danger Area II" munitions testing and live-firing exercises it plans to conduct during the second session of waterfowl hunting season. (Doc. No. 14 at 12 (citing 33 C.F.R. § 334.850(c)(2))).

GDLS alleges the scheduled testing must be conducted "on a near-daily basis after November 20, 2026, through at least December 14, 2026" so that it can fulfill its contractual obligations to the United States Army. (Doc. No. 14-4 at 3). While it acknowledges the deadline for completion of these tests has "slipped," it maintains the testing must move forward now, particularly in light of the impending winter season. (Doc. No. 25 at 105, 118-19). After Lake Erie has frozen over, the subject "Danger Zone" will close, and GDLS will be prohibited from conducting any tests. (*Id.* at 118-19).

The parties agree that GDLS cannot conduct munitions testing and live-firing exercises when Club members are on the 643 land. (*See* Doc. No. 14-4 at 8 (quoting Doc. No. 6-1 at 21)). And unfortunately, the hours GDLS is permitted to conduct its operations directly conflict with the hours the Club's members are permitted to hunt.[3] But unlike GDLS's operational restrictions, the Club is permitted to hunt on weekends and holidays. Additionally, the Club's members are able to

---

[3] During this relevant session of open season from November 14, 2026 through December 27, 2026, the sun is set to rise in the area of the property between approximately 7:20 a.m. and 7:55 a.m., and the sun sets no later than 5:10 p.m. *See* https://www.weather-temperature.net/sunrise-sunset-times/5170691/.

hunt on the Club's own adjacent 1,147 acreage during the time it would be excluded from the 643 if GDLS is permitted to enforce the restriction.

Still, the Club contends the non-holiday, weekday exclusion from GDLS's land will cause it irreparable harm because:

> Money damages cannot adequately remedy the loss of a limited hunting season, the safety risk created by live fire exercises during that season, the threatened loss of the Club's century-old mission, the degradation of approximately 1,700 acres of wetland habitat, or the loss of flood protection and water quality benefits provided by the marsh and dike system.

(Doc. No. 6-2 at 4). Therefore, the Club seeks a preliminary injunction to "remain in effect through December 27, 2026, or until final judgment, whichever is earlier" enjoining GDLS from:

> (1) excluding, barring, or denying entry to the Club or its members on the Property for the purpose of hunting waterfowl or maintaining the dikes and dams on the Property; (2) conducting testing or live-fire exercises on the Property, which cannot safely occur while the Club and its members are on the Property exercising those reserved rights; and (3) otherwise interfering with the Club's exercise of its reserved right to hunt waterfowl and maintain the dikes and dams on the Property.

(Doc. No. 6-1 at 21-22).

## III. Discussion

"When faced with requests for a preliminary injunction, district courts consider four factors: (1) the plaintiff's likelihood of success on the merits; (2) the risk of irreparable harm to the plaintiff in the absence of an injunction; (3) the risk that an injunction will harm others; and (4) the broader public interest." *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 512-13 (6th Cir. 2026) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

In theory, "[t]he preliminary injunction factors do not represent a list of 'prerequisites to be met,' *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017), and 'no one factor is controlling,' *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)." *PCC Airfoils, LLC*, 176 F.4th at 513. But, in practice, both "the plaintiff's likelihood of success on the merits" and "the risk of irreparable harm to the plaintiff in the absence

of an injunction" are effectively prerequisites that must be met. *Id.* If the plaintiff has no likelihood of success on the merits, or fails to show any risk of irreparable injury, the plaintiff's request for a preliminary injunction must be denied. *Id.* (citing *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024); *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982); and *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)). I address each of these factors, in turn.

### A. THE CLUB'S LIKELIHOOD OF SUCCESS

The Club alleges it is likely to succeed in showing it has an unrestricted right to access the land for purposes of hunting, trapping, and maintaining dikes and dams through its claims: (1) to quiet title; (2) for prescriptive easement; and (3) for easement by estoppel. (Doc. No. 6-1 at 11-19). GDLS disputes that the Club has any right to access the land and, alternatively, argues any right of access the Club does have is restricted by certain conditions.

#### 1. Quiet Title

The Ohio Revised Code creates the private right of action to quiet title, providing:

> An action may be brought by a person in possession of real property, by himself or tenant, against any person who claims an interest therein adverse to him, for the purpose of determining such adverse interest. Such action may be brought also by a person out of possession, having, or claiming to have, an interest in remainder or reversion in real property, against any person who claims to have an interest therein, adverse to him, for the purpose of determining the interests of the parties therein.

O.R.C. § 5303.01. Here, the Club seeks to quiet title to General Dynamic's property under the latter. But, as the Club implicitly admits, (Doc. No. 6-1 at 12), the success of its quiet title claim depends on the whether GDLS's title is subject to the Club's 1918 interest under Ohio's Marketable Title Act ("MTA"), O.R.C. § 5301.47, *et seq.*

In 1961, the Ohio General Assembly enacted the MTA "to extinguish interests and claims in land that existed prior to the root of title, with 'the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title.'" *Corban v. Chesapeake*

*Expl., L.L.C.*, 76 N.E.3d 1089, 1094 (Ohio 2016) (quoting O.R.C. § 5301.55). Under the MTA, a person "who has an unbroken chain of title of record to any interest in land for forty years or more, has a marketable record title to such interest," O.R.C. § 5301.47(A), and:

> [s]ubject to the matters stated in section 5301.49 of the Revised Code, such record marketable title shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title. All such interests, claims, or charges, however denominated, whether legal or equitable, present or future, whether such interests, claims, or charges are asserted by a person sui juris or under a disability, whether such person is within or without the state, whether such person is natural or corporate, or is private or governmental, are hereby declared to be null and void.

O.R.C. § 5301.50.

Those "matters stated in section 5301.49" to which an owner's marketable record title remains "subject" include:

> (A) All interests and defects which are inherent in the muniments of which such chain of record title is formed; provided that a general reference in such muniments, or any of them, to easements, use restrictions, or other interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such easement, use restriction, or other interest; and provided that possibilities of reverter, and rights of entry or powers of termination for breach of condition subsequent, which interests are inherent in the muniments of which such chain of record title is formed and which have existed for forty years or more, shall be preserved and kept effective only in the manner provided in section 5301.51 of the Revised Code;
>
> (B) All interests preserved by the filing of proper notice or by possession by the same owner continuously for a period of forty years or more, in accordance with section 5301.51 of the Revised Code; [and]
>
> . . .
>
> (E) The exceptions stated in section 5301.53 of the Revised Code.

O.R.C. § 5301.49(A), (B), and (E).

Put simply, "[t]he Marketable Title Act extinguishes property interests by operation of law after 40 years from the effective date of the root of title unless a saving event has occurred." *West v.*

*Bode*, 165 N.E.3d 298, 302 (Ohio 2020). Section 5301.49 defines those saving events and "serve[s] as a shield to protect the excepted interests from extinguishment." *Id.*

The Club does not dispute that GDLS has marketable record title to the land in question. But it contends GDLS's title is subject to the Club's 1918 interest because that interest was preserved by at least one of section 5301.49's savings events.

There is some confusion and tension about which deed is the root of title – the 1967 deed or a 1986 deed. (*See* Doc. No. 6-1 at 14-15, Doc. No. 14 at 17, and Doc. No. 15 at 4-10). For its part, the Club does not advocate for the application of one over another but instead offers alternative arguments "[i]f the 1967 deed . . . is the 'root of title'" versus "[i]f the root deed is the 1986 conveyance." (Doc. No. 15 at 4-10; *see also* Doc. No. 6-1 at 14-15). Because the root-of-title identification is somewhat unsettled under Ohio law under circumstances such as these, *see David v. Paulsen*, 137 N.E.3d 689, 694-95, 695 n.2 (Ohio Ct. App. 2019), I address the Club's arguments in turn rather than identifying the root of title at this juncture.

**i. O.R.C. § 5301.49(A)**

The Club first alleges the 1918 interest was preserved under Section 5301.49(A) because it is specifically identified in the 1967 deed. The Club admits it cannot succeed under this section if the 1986 deed is the root of title.

As stated above, the MTA preserves:

> All interests and defects which are inherent in the muniments of which such chain of record title is formed; provided that a general reference in such muniments, or any of them, to easements, use restrictions, or other interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such easement, use restriction, or other interest; . . .

O.R.C. § 5301.49(A).

For courts analyzing whether an interest falls within the purview of Section 5301.49(A), the Supreme Court of Ohio has instructed:

> Th[is] statute presents a three-step inquiry: (1) Is there an interest described within the chain of title? (2) If so, is the reference to that interest a "general reference"? (3) If the answers to the first two questions are yes, does the general reference contain a specific identification of a recorded title transaction?

*Blackstone v. Moore*, 122 N.E.3d 132, 136 (Ohio 2018).

GDLS does not meaningfully dispute that the answer to the first inquiry is "yes." Put otherwise, the parties implicitly agree that the first inquiry is satisfied by the 1967 deed's language:

> SUBJECT TO:
>
> > Any and all existing reservations, leases, licenses, easements and rights, recorded or unrecorded, for mineral, public roads, railroads, pipe lines, drainage, sewer mains and lines, public utilities, and *hunting and trapping*.

(*Id.* at 31) (emphasis added).

Conversely, the Club does not meaningfully dispute that the answer to the second inquiry is "yes." (*See* Doc. No. 15 at 5; Doc. No. 6-1 at 13-14). Indeed, I agree with GDLS, that the reference to an existing "hunting and trapping" interest within the catchall list of "any and all existing" interests "recorded and unrecorded" is a "general reference." This clause, including the reference to "hunting and trapping," is not "characterized by precise formulation or accurate restriction (as in stating, describing, defining, reserving)" or otherwise "free from . . . ambiguity." *Blackstone*, 122 N.E.3d at 136 (further citation omitted).

I turn now to the third inquiry, where the dispute here lies. The Club alleges the answer to this question is also "yes" because the 1967 deed "*specifically* identifies the United States Government's 1918 acquisition from the Club [and] identifies the Volume and Page in the Ottawa County Records for the 1918 reservation." (Doc. No. 6-1 at 13-14 (citing Doc. No. 1-2 at 29)) (emphasis in original). GDLS concedes this is a "half-truth." (Doc. No. 14 at 19).

To support its argument, the Club relies on the following language in the 1967 deed, which concludes the description of the land to be conveyed:

> Grantor acquired its interest in the above described premises through instruments recorded at Volume 123, page 351; Volume 124, page 007; and Volume 79, pages 76, 93, 94, 95, 96, 97, 98, 113, 185, 186, 187, and 270 of the Ottawa County Deed Record.

(Doc. No. 1-2 at 29). It is a stretch to say this description of the land's provenance "*specifically* identifies the United States Government's 1918 acquisition from the Club," as the Club alleges. (Doc. No. 6-1 at 13) (emphasis added). Indeed, the description contains only Volumes and page numbers at which various "instruments [are] recorded," (Doc. No. 1-2 at 29), and does not identify the parcel or parcels to which any of these instruments apply, let alone when or from whom the United States acquired any of the respective parcels. Further, the 1967 deed does not reference the Volume and page number of the United States' October 24, 1918 acquisition from the Club – Volume 79, page 278 (or 278-279). (*See* Doc. No. 1-2 at 22-23). Nevertheless, the 1967 deed *does* specifically identify the Volume and page number at which the August 9, 1918 acquisition "instrument[ was] recorded,"– "Volume 79, page[ ] . . . 187." (Doc. No. 1-2 at 29 (citing Doc. No. 1-2 at 20-21)).

The question then becomes whether "specific identification be made therein of a recorded title transaction which creates such easement, use restriction, or other interest" requires "specific identification be made" in the "muniment" as a whole or in the "general reference." O.R.C. § 5301.49(A). GDLS contends the "recorded title transaction" must be "specifical[ly] identified" in the "general reference." (Doc. No. 6-1 at 13-14). The Club counters that this "specific identification" can be made anywhere in the deed. (Doc. No. 15 at 7-8). But unfortunately for the Club, Ohio courts agree with GDLS:

> in all of caselaw springing from *Blackstone* that has interpreted the MTA general/specific prior interest problem, the most important consideration was whether the general reference to a prior interest contains wording within the reference itself specifically identifying a prior recorded title transaction. It is not enough that somewhere in the entire document there is vague mention in some portion that a prior recorded title transaction exists.

*RL Clark, LLC v. Hammond*, 2024-Ohio-5051, ¶ 37, 2024 WL 4534583, at *7 (Ohio Ct. App. 2024). Put simply, O.R.C. § 5301.49(A) can save an otherwise "general reference" only when the "general reference specifically identifies the relevant recorded title transaction." *Erickson v. Morrison*, 176 N.E.3d 1, 8 (Ohio 2021).

Here, there is no meaningful dispute that the "general reference" to a "hunting and trapping" interest does not "specifically identif[y] the relevant recorded title transaction." *Id.* Therefore, the Club's interest is not saved under the "specific identification" clause of O.R.C. § 5301.49(A).

**ii. O.R.C. § 5301.49(B)**

The Club next contends the 1918 interest was preserved by its Notice recorded on February 6, 1986, in the Ottawa Couty Record at Volume 315, page 0719.[4] (Doc. No. 15 at 9). Or, if the 1986 deed is the root of title, the Club alleges the 1918 interest was preserved by the its 2008 or 2020 Notices.

Under Section 5301.49(B), a marketable record title is "subject to . . . [a]ll interests preserved by the filing of proper notice . . . in accordance with section 5301.51 of the Revised Code." O.R.C. § 5301.49(B).

At the time of the 1986 Notice, Section 5301.51(A) "permitt[ed] a person claiming an interest in land to record 'a notice in writing, duly verified by oath, setting forth the nature of the claim[.]" *Erickson*, 176 N.E.3d at 7 (quoting O.R.C. § 5301.51(A) (eff. 1986)). But "[i]n 1988, . . . the General Assembly amended the Marketable Title Act to require greater specificity in order for recorded notices to preserve preexisting interests." *Id.* Thus, after 1988, "[t]o be effective and

[4] While a heading of the Club's motion states, "[t]he 1986 Notice preserves the Club's hunting reservation from 1918," it does actually argue this point in that or any other section of its motion. (*See* Doc. No. 6-1 at 14-15). But it does address this point in response to GDLS opposition brief arguments that none of the Club's notices save its interest.

entitled to recording, the notice referred to in section 5301.51 of the Revised Code shall satisfy all of the following:

> (1) Be in the form of an affidavit;
>
> (2) State the nature of the claim to be preserved and the names and addresses of the persons for whose benefit the notice is being filed;
>
> (3) Contain an accurate and full description of all land affected by the notice, which description shall be set forth in particular terms and not by general inclusions, except that if the claim is founded upon a recorded instrument, the description in the notice may be the same as that contained in such recorded instrument;
>
> (4) State the name of each record owner of the land affected by the notice, at the time of its recording, together with the recording information of the instrument by which each record owner acquired title to the land;
>
> (5) Be made by any person who has knowledge of the relevant facts or is competent to testify concerning them in court.

Ohio Rev. Code § 5301.52(A).[5] This section further provides, "[a]ny person who knowingly makes any false statement in a notice executed under this section is guilty of perjury under section 2921.11 of the Revised Code." O.R.C. § 5301.52 (D).

Both the pre-1988 and post-1988 versions of Section 5301.51(A) required the Notice be "fil[ed] for record during the forty-year period immediately following the effective date of the root of title of the person whose record title would otherwise be marketable" and warned "[n]o disability or lack of knowledge of any kind on the part of anyone suspends the running of the forty-year period." O.R.C. § 5301.51(A). *See, e.g., Verona United Methodist Church v. Shock*, No. CA 252, 1978

[5] The Club offers an alternate argument in the event the pre-1988-amendment version of section 5301.51 applies. (Doc. No. 15 at 9-10). Similar to its root-of-title argument, the Club does not advocate for application of one over the other or provide any legal argument or authority to suggest which version should apply. Without this, but with the MTA's mandate that "[n]o . . . lack of knowledge of any kind on the part of anyone suspends the running of the forty-year period," O.R.C. § 5301.51(A), I conclude the post-1988, current version of section 5301.51 applies. Any lack of knowledge on the part of the Club of the 1988 amendment does not excuse the Club's failure to file a post-amendment notice prior to 2007.

WL 216179, at *3 (Ohio Ct. App. Oct. 13, 1978) (quoting, in full, the pre-1988 version of O.R.C. § 5301.51(A)).

GDLS first argues the 2008 and 2020 Notices cannot save the 1918 interest because the interest was extinguished in 2007 – forty years after the 1967 deed, which was the root of title at the time GDLS acquired the land in March 2025. (Doc. No. 14 at 20-21). The Club admits the 1967 deed was the root of title at that time. (*See* Doc. No. 6-1). And while the Club maintains that "[i]f the root deed is the 1986 conveyance, . . . the 2008 Notice satisfies the statute and preserves the Club's reservation," (Doc. No. 15 at 9), the Club does not meaningfully dispute that: (1) any pre-1967 interest not otherwise saved by a Section 5301.49 savings event was extinguished in 2007; and (2) an interest extinguished cannot be revived.

Indeed, the Club cannot dispute these points. The Supreme Court of Ohio has held that the MTA extinguishes pre-root-of-title property interests "by operation of law after 40 years from the effective date of the root of title unless a saving event preserving the interest appeared in the record chain of title —i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest '[arose] out of a title transaction which has been recorded subsequent to the effective date of the root of title.'" *Corban*, 76 N.E.3d (citing O.R.C. §§ 5301.48 & 5301.49). And "[a]n interest that has been extinguished by operation of the Marketable Title Act cannot be revived." *West*, 165 N.E.3d at 302 (citing O.R.C. § 5301.49(D)).

When determining the marketability of the title it was looking to acquire in March 2025, GDLS was to rely on the January 4, 1967 deed as the root of title. Unless a savings event preserving a pre-1967 interest appeared in the record chain of title between January 4, 1967 and January 4, 2007, the MTA extinguished that pre-1967 interest by operation of law after January 4, 2007. If the pre-1967 interest was not "saved" by January 4, 2007, it was "null and void." O.R.C. § 5301.50. No

savings event that occurred after January 4, 2007 could revive the "null and void" interest. *West*, 165 N.E.3d at 302 Thus, in reliance on the 1967 deed, GDLS could conclude the title it would acquire in March 2025 would be "taken . . . free and clear of" any pre-1967 interest that became "null and void" after January 4, 2007, and that any Section 5301.51(A) Notice filed after January 4, 2007 purporting to preserve any "null and void" pre-1967 interest was not valid. *Id.*

In short, GDLS is correct in its assertion that if the 1918 interest was not preserved by the 1986 Notice, it became "null and void" after January 4, 2007, and neither the 2008 nor the 2020 Notices could revive it. After all, the Club concedes the 1986 deed did not "save" the 1918 interest, and for the reasons stated above, the 1967 deed did not "save" the 1918 interest.

GDLS next argues that even if the 1986 Notice was timely, it did not save the 1918 interest because it did not meet Section 5301.51(A)'s requirements. Specifically, GDLS contends the 1986 Notice does not satisfy the more specific, post-1988-amendment notice requirements because it "does not identify CIC, the record owner at the time, anywhere in the document." (Doc. No. 14 at 20). GDLS also alleges the 1986 Notice does not satisfy the pre-1988-amendment "duly verified by oath" requirement or the post-1988-amendment "affidavit" requirement because it "contains an acknowledgment – not a jurat." (Doc. No. 18-1 at 4).

As noted by the Club, (Doc. No. 15 at 9), the 1986 Notice does reference the "quit-claim deed from United States to Community Improvement Corporation of Ottawa County, executed and received for record on January 3, 1967 and recorded in Volume 233, Page 1045 of the Ottawa County Records." (Doc. No. 1-2 at 35). GDLS does not address this reference or make any attempt to explain why this reference does not adequately identify Community Improvement

Corporation, or "CIC," as the record owner at the time.[6] (*See* Doc. No. 14 at 20-21). As such, I reject this argument.

But at this juncture, I agree with GDLS as to its second argument, in part. It is undisputed that under the pre-amendment version of Section 5301.51(A), the 1986 Notice had to be "duly sworn under oath" to be effective. Similarly, under the post-amendment version of Section 5301.51(A), the Notice had to "be in the form of an affidavit," O.R.C. § 5301.52(A)(1), which Ohio law defines as "a written declaration under oath." O.R.C. § 2319.02; *see, e.g., State ex rel. Maras v. LaRose*, 199 N.E.3d 532, 535 (Ohio 2022). Confirming as much, the post-amendment version[7] warns that "[a]ny person who knowingly makes any false statement in a notice executed under this section is guilty of perjury under section 2921.11 of the Revised Code," a statute that applies only to "statement under oath or affirmation." O.R.C. §§ 5301.52(D), 2921.11.

The Club does not meaningfully dispute that the 1986 Notice must have been made under oath regardless of which version of the statute applies. The Club also does not dispute that the 1986 Notice's notarial certificate takes the form of an acknowledgment rather than a jurat. (*See* Doc. No. 1-2 at 35). But as the Club correctly notes, an "area of somewhat unsettled law in Ohio," (Doc. No. 21 at 4 n.1), is whether a written statement meets the "under oath" requirement if the "[t]he notarial certificate was in the form of an acknowledgement rather than a jurat." *Grinder v. Schaaf*, 277 N.E.3d 368, 376-77 (Ohio Ct. App. 2026).

Recently, the Supreme Court of Ohio concluded that despite being in the form of an acknowledgement, the notarial certificate was a valid jurat because it was evident "[t]hat the notary

[6] During the preliminary injunction hearing, I asked GDLS about this point. In response, GDLS's counsel referenced a footnote related to improper indexing. But it appears that improper indexing challenge was made to the 2008 Notice and not the 1986 Notice. (*See* Doc. No. 14 at 20-21, 21 n.6).

[7] The pre-amendment version may also contain this language. The full text of this previous version of the statute was not readily available to me on the expedited timeline here.

administered the oath . . . when the document is read in full." *Maras*, 199 N.E.3d at 535. The Court explained,

> In the first line of her affidavit, Maras represented that she "[had] been duly sworn." To accept Secretary LaRose's construction of the affidavit, we would have to conclude that Maras appeared before one notary to take the oath and then appeared before a second notary solely to attest that she signed the affidavit "as [her] free act and deed." This is an illogical conclusion.

*Id.* at 535-36

Here, the Club does not allege the 1986 Notice contains any similar language from which I could conclude the 1986 Notice was "duly sworn under oath" or otherwise made "under oath or affirmation" such that, if false, could be penalized by perjury. A review of the 1986 Notice reveals no such language. (*See* Doc. No. 1-2 at 34-35).

Implicitly admitting the 1986 Notice does not, on its face, indicate it was a statement sworn under oath, the Club contends that it "may ultimately *prove* that an oath was administered, including by extrinsic evidence" and that "[d]etermining whether extrinsic evidence proves an oath was administered may require its own evidentiary hearing and may be necessary *later*, but the Club is likely to succeed on any one of the merit roads *now*." (Doc. No. 21 at 4-5). Essentially, the Club acknowledges that, at this juncture, it has not shown it is likely to succeed on the merits on its claim that its 1918 interest was preserved by the 1986 Notice. I agree.[8]

At this stage, I conclude that because the 1986 Notice does not satisfy the substantive requirements, and because the Club identifies no other savings event in the record chain of title between January 4, 1967 and January 4, 2007, the 1918 interest became "null and void" after January 4, 2007 and, therefore, could not be revived by the 2008 or 2020 Notices. The Club is not likely to succeed on the merits of its claim that the 1918 interest was saved under Section 5301.49(B).

---

[8] Whether the Club could obtain this evidence is suspect because, unfortunately, at least one of the individuals that signed the Notice appears to have passed away. *See* Obituary of E. Lang D'Arti, available at *https://www.arnoldfuneralhome.com/obituaries/e-datri*.

**iii. O.R.C. § 5301.49(E)**

The Club next alleges its interest was preserved by one of section 5301.53's exceptions incorporated by reference into Section 5301.49. *See* O.R.C. § 5301.49(E). Specifically, the Club alleges one or both of the following apply:

> (C) Any easement or interest in the nature of an easement, the existence of which is clearly observable by physical evidence of its use;
>
> (D) Any easement or interest in the nature of an easement, or any rights granted, excepted, or reserved by the instrument creating such easement or interest, including any rights for future use, if the existence of such easement or interest is evidenced by the location beneath, upon, or above any part of the land described in such instrument of any pipe, valve, road, wire, cable, conduit, duct, sewer, track, pole, tower, or other physical facility and whether or not the existence of such facility is observable;

Ohio Rev. Code § 5301.53(C)-(D).

The Club asserts the 643 has "clearly observable by physical evidence of its use" of the 1918 interest and that the Club's 1918 interest is "evidenced by . . . physical facilit[ies]" on the 643. (Doc. No. 6-1 at 16). The Club alleges that evidence takes the form of "numerous dams, dikes, roads, and other water-control structures or drainpipes the Club has and does maintain." (Doc. No. 6-1 at 16). At the hearing, the Club also alleged it conducted controlled burns on the property to as part of its maintenance to the property.

As noted by GDLS, (Doc. No. 14 at 21), none of these things are physical evidence of the 1918 *hunting* interest the Club is seeking to preserve through these preliminary injunction proceedings. Instead, all of these structures and activities relate to the Club's conservation efforts related to its 1918 interest in access to the 643 for purposes of maintenance.

The Club does not dispute this point in its reply. In fact, nowhere in its reply does the Club renew its allegation that either of these exceptions apply. The Club also offered no evidence at the preliminary injunction hearing to support a finding that "clearly observable by physical evidence of its use" of its 1918 hunting interest or that the 1918 hunting interest is "evidenced by . . . physical

facilit[ies]" on the 643. Instead, during the preliminary injunction hearing, Mr. Kaatz testified the Club had no structures on the land other than the dikes and dams and explained Club members hunt by boat in the 643 and do not use blinds. (Doc. No. 25 at 79-80).

To the extent to the Club alleges its members hunting can themselves serve as "clearly observable . . . physical evidence" of the Club's use of the 1918 right to hunt, I conclude that this is not the type of evidence contemplated by the MTA. "The statutory exception reflects the basic principle that certain physical conditions may serve to provide a landowner with notice that an easement exists[.]" *Hobbs v. Dean*, No. 800409, 1981 WL 9890, at *3 (Ohio Ct. App. July 8, 1981). And, like every other Section of the MTA, the "clearly observable . . . physical evidence" exception must "be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title as described in section 5301.48 of the Revised Code, subject only to such limitations as appear in section 5301.49 of the Revised Code.." O.R.C. § 5301.55. Allowing Club members' hunting on the land during Ohio's limited waterfowl season to serve as "clearly observable . . . physical evidence" would frustrate that purpose.

Without more, I must conclude neither exception shields the Club's hunting and trapping interest from extinguishment by the MTA.

### 2. Prescriptive Easement

While Ohio law recognizes prescriptive easements, they "are not favored in law, because the legal titleholder forfeits rights to another without compensation."[9] *Cadwallader v. Scovanner*, 896 N.E.2d 748, 762 (Ohio Ct. App. 2008). "To prove that a prescriptive easement exists, a party must show, by clear and convincing evidence, that he has used the property (1) openly, (2) notoriously, (3)

[9] While the Club states prescriptive easement as a separate claim, I note that the MTA recognizes that a marketable record title is "subject to . . . [t]he rights of any person arising from a period of adverse possession or user, which was in whole or in part subsequent to the effective date of the root of title." O.R.C. § 5301.49(C).

adversely to the property rights of the servient estate's owner, (4) continuously, and (5) for a period of at least 21 years." *McCumbers v. Puckett*, 918 N.E.2d 1046, 1049 (Ohio Ct. App. 2009).

Relevant here, "[u]se is adverse when it is without permission and inconsistent with the rights of the property owner." *Cadwallader*, 896 N.E.2d at 763 (citing *Kimball v. Anderson*, 181 N.E. 17 (Ohio 1932)). "[A] party's *permissive use* of land cannot ripen into an easement by prescription, no matter how long it may be continued." *McCumbers*, 918 N.E.2d at 1049 (citing *Pa. R.R. Co. v. Donovan*, 145 N.E. 479, 482 (Ohio 1924); and *Monroe Bowling Lanes v. Woodsfield Livestock Sales*, 244 N.E.2d 762, 766 (Ohio Ct. App. 1969)).

GDLS contends any hunting and trapping interest claimed by the Club was not a prescriptive easement because it was not "adverse" but "permissive." (Doc. No. 14 at 22-23). In support, it points to the Club's Complaint and evidence showing:

> the Club could hunt during the military period only "under license from the Commanding Officer" and the Club asserts that it exercised its claimed rights "in coordination and without conflict" with the United States, "consistently provided courtesy and safety notice of its presence" to the fee owners, and that prior owners "recognized and did not interfere with" its activities. *Complaint, ¶¶ 3, 6, 24, 43, 44; Kaatz Decl., ¶¶ 24, 44, 45.*

(*Id.* (quoting Doc. No. 1-2 at 2-3, 5, 9; and Doc. No. 6-2 at 6, 10)).

In response, the Club implicitly acknowledges that its interest was not adverse during the period of 1918-1967. (Doc. No. 15 at 13). Thus, the relevant period for the Club's prescriptive easement claim is that time after the United States conveyed the land to CIC in 1967. Of this period, the only argument the Club makes with respect to whether its use was "adverse" is to state, "[n]otifying a fee owner for safety reasons is not asking for permission." (Doc. No. 15 at 14). But the Club misses the mark. The relevant inquiry is whether the previous fee owners granted the Club permission to hunt and trap on the land, not whether the Club asked for permission. Had a fee owner denied permission and the Club hunted anyway, the Club's argument would have arguably

been strengthened. It appears the opposite occurred here. The Club notified the previous fee owners, and the previous owners permitted the Club to hunt and trap on the land.

Because the facts supplied by the Club indicate its use since 1967 has been permissive, I must conclude the Club is not likely to succeed on its prescriptive easement claim.

### 3. Easement by Estoppel

Whether Ohio recognizes a claim of easement by estoppel has not yet been decided by the Supreme Court of Ohio. As late as 2024, an Ohio appellate court affirmed that "[w]hile 'research has not revealed any cases in which the Supreme Court of Ohio has explicitly or implicitly recognized easements by estoppel, it has also not revealed any cases in which that court declined to recognize such an easement despite the presence of actual or constructive fraud.'" *Garcia v. Ewais*, 249 N.E.3d 826, 837 n. 8 (Ohio Ct. App. 2024) (quoting *Fling v. Daniel*, 130 N.E.3d 319, 325-26 (Ohio Ct. App. 2019)). In the absence of guidance from the Supreme Court of Ohio, lower courts in Ohio have recognized easements by estoppel. *See Fling*, 130 N.E.3d at 326 (citing cases).

Those courts recognizing easement by estoppel have held: "'A landowner cannot remain silent and permit another to spend money *in reliance on a purported easement*, when in justice and equity the landowner should have asserted his conflicting rights. If he fails to object, under these circumstances the landowner is estopped to deny the easement.'" *Fling*, N.E.3d at 326 (quoting and adding emphasis to *Pinkerton v. Salyers*, 2015-Ohio-377, 2015 WL 459267, at *8 (Ohio Ct. App. 2015)). "While courts are generally reluctant to find an easement by estoppel based on, for example, passive acquiescence, if injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be

revoked, and the user did substantially change position in reasonable reliance on that belief." *Garcia*, 249 N.E.3d at 838 (cleaned up).

The Club alleges GDLS is estopped to deny the Club's hunting and trapping interest because it "allowed Club members to hunt in 2025, . . . and said nothing until September 2026—after the Club spent its usual sums preparing the marsh and its members bought licenses and stamps." (Doc. No. 15 at 14).

GDLS does not dispute that: (1) it allowed Club members to hunt on the land during the 2025 hunting season; (2) the Club expended funds on dikes and dams on the land between the 2025 hunting season and September 2026; and (3) Club members expended funds on licenses and stamps for the 2026 hunting season. (Doc. No. 14 at 23-24). Further, while GDLS maintains its silence cannot give rise to an easement by estoppel because it was under no duty to speak, (*id.*), it does not meaningfully address whether it was reasonable to foresee that the Club would substantially change position believing that the permission to hunt on that land would not be revoked. But GDLS contends "[e]xpenditures the Club would have made regardless, for its own benefit, are not detrimental reliance." (*Id.* at 24).

First, GDLS asserts the Club's members would have purchased the hunting licenses and stamps to hunt "on the 1,100 acres the Club itself owns" and not in reliance on the belief that it could *also* hunt on the additional acres owned by GDLS. (*Id.* at 24). The Club does not meaningfully dispute this point. That is, the Club does not allege its members would have skipped the 2026 hunting season if they had known they could not hunt on the land owned by GDLS. Accordingly, I conclude the licenses and stamps do not evince detrimental reliance.

And second, GDLS alleges the Club cannot show it maintained the dikes and dams in advance of the 2026 hunting season in *detrimental* reliance on the belief it could hunt on the land during the 2026 season "because it has made these expenditures annually 'for over a century' to

protect, in part, its own adjacent marsh." (Doc. No. 14 at 24). The Club does not meaningfully dispute this point in its reply. And Mr. Kaatz confirmed during the hearing that had the Club known it could only hunt on its own property during the 2026 hunting season, and not also on the 643, the Club still would have performed the maintenance to the 643 because it "would need to in order to protect the habitat." (Doc. No. 25 at 81). Because the Club would have expended funds to maintain the dikes and dams even if it knew it would not be permitted to hunt on GDLS's land in 2026, these expenditures cannot serve as evidence of detrimental reliance.

At this juncture, the Club has not shown it substantially changed its position in reasonable reliance on its belief that permission to hunt on the land would not be revoked. Therefore, I must conclude it is not likely to succeed on its claim that it possessed an easement by estoppel to hunt and trap on the land.

---

For the reasons stated above, I cannot conclude the Club is likely to succeed on any of its claims. That is, based on the evidence currently before me, the Club has "'no likelihood of success on the merits,' there is nothing left to balance[,] and the plaintiff's request for a preliminary injunction must fail regardless of its showing on the other factors." *PCC Airfoils, LLC*, 176 F.4th at 513 (quoting *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024)).

### B. RISK OF IRREPARABLE HARM TO THE CLUB

Even if the Club could show it is likely to succeed on the merits of any of its claims, it has not shown any risk of irreparable injury absent a preliminary injunction.

"To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). And of course, the injury must be "irreparable":

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (further citation omitted).

As noted above, the Club seeks a preliminary injunction to "remain in effect through December 27, 2026, or until final judgment, whichever is earlier." (Doc. No. 6-1 at 22). The Club alleges that, without this injunction, irreparable harm will result to the Club, its members, and the marsh.

At the outset, I reject the Club's claim that the "narrow and precise" preliminary injunction it seeks would reduce any risk of irreparable harm to the marsh. (Doc. No. 15 at 16). As noted, the injunction sought by the Club would only be effective through December 27, 2026. Club President Don Kaatz testified that the Club had no remaining dike or dam maintenance scheduled for 2026, and maintenance to the dikes and dams for the remainder of 2026 would only be necessary if "any emergency . . . comes up because of nature." (Doc. No. 25 at 70). Because any injury to the dikes and dams during the period subject to the injunction is speculative and theoretical, I must reject the Club's suggestion that the dikes, dams, and, in turn, the marsh risk irreparable harm in the absence of the injunction.

Remaining is the Club's assertion that it will suffer irreparable harm if its 18 members are barred from the 643 from 8:00 a.m. until 5:00 p.m., Monday through Friday, excluding holidays, during the second session of hunting season.[10] In support, the Club alleges that given the sunrise and sunset hours on the property at this time of year, GDLS's exclusion "leaves the Club little

[10] GDLS has confirmed there are no current plans to conduct any testing after December 14. Thus, one may conclude from the parties' otherwise amicable relationship that the Club and its members would be permitted to access GDLS's property on weekdays after December 14. Nevertheless, based on GDLS's somewhat "fluid" schedule, I consider the full duration of hunting season – that is, through December 27.

usable weekday hunting time." (Doc. No. 15 at 15). It also asserts "the Club's own acreage is no substitute; the reservation attaches to *this* land, and interests in real property are unique." (*Id.*). By way of harm, the Club asserts generally that "[a] hunting season that passes cannot be given back," (*id.*), and more specifically, Mr. Kaatz testified that in the absence of an injunction, the Club "would probably lose members because of it. They would say, 'I've paid too much to not enjoy what I've paid for.'" (Doc. No. 25 at 67).

While I do not doubt that Mr. Kaatz fears the Club will lose members if they are not able to hunt on the 643 on non-holiday weekdays for the remainder of this season, there is no record evidence to show this fear will become a reality. There is nothing from which I could conclude the Club will drop below its eighteen maximum members if the injunction is not granted. Put simply, the injury of losing members is speculative, not certain. Therefore, it cannot give rise to a finding of irreparable harm under the law.

Aside from the speculation that the Club will lose members, the only remaining harm is the Club's general suggestion that "[a] hunting season that passes cannot be given back." (Doc. No. 15 at 15). But the limited restriction GDLS seeks to enforce does not result in a lost hunting season. There is no dispute that, aside from the limited, early morning weekday hours, the Club members can continue to hunt on all 1,790 acres all day on Saturdays, Sundays, and holidays. Further, the Club does not meaningfully dispute that its members can still hunt on the Club's own 1,147 acres on non-holiday weekdays. Still, the Club contends it needs the 643 at all times during hunting season because all eighteen of its members cannot hunt on the Club's own 1,147 acres at once and because the 643 includes some of its most productive areas.

With respect to capacity, Mr. Kaatz testified that all eighteen members could not hunt on the Club's own 1,147 acres at one time because it is too small. (Doc. No. 25 at 75). But Mr. Kaatz's also testified that while all eighteen members hunt "on at least two if not three days of the season,

meaning the opening days when it's starting in the first session and the second and Thanksgiving," "the number of people varies day to day" – there may be "one or 16 or 12", "it's all over the board [and] depends on their availability." (*Id.* at 60, 69, 79). Mr. Kaatz also admitted "there is more hunting on the weekend, less during the week." (*Id.* at 69).

And with respect to production, Mr. Kaatz testified the 643 "represents between 25 and 30 percent of the annual harvest" as compared to the 1,790 acres as a whole. (*Id.* at 47).

Based on record evidence, I cannot conclude that being excluded from the 643 on non-holiday weekdays would effectively result in a lost hunting day to the Club's members. It is unlikely that all eighteen members would want to hunt on any of the non-holiday weekdays at issue such that one or more of the Club's members would be denied the right to hunt altogether on any of the days at issue. Further, if the 643 represents 25 to 30 percent of the harvest, one may infer the Club's own 1,147 acres produces the other 70 to 75 percent. That is, based on the Club's own evidence, its land produces at least as many waterfowl per acre if not more. Therefore, I cannot conclude the Club's own land is so lacking that being excluded from it on non-holiday weekdays would effectively result in a lost day of hunting season to the Club's members.

I acknowledge that the Club members would have a more enjoyable experience if not bound to the confines of the Club's own acreage. But the limited restriction GDLS seeks to enforce would not result in a hunting season lost, as the Club suggests. At this stage, the Club has not shown that being confined to its own land on weekdays from 8:00 a.m. until 5:00 p.m. during the second session of hunting season would result in an injury to the Club that cannot be later redressed by adequate compensatory or other corrective relief. *See Sampson*, 415 U.S. at 90. As such, I cannot conclude the Club is likely to suffer any irreparable injury in the absence of a preliminary injunction, let alone an "'irreparable' injury that warrants the 'extraordinary remedy' of a preliminary injunction." *D.T.*, 942 F.3d at 327 (quoting *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)).

### C. Risk of Harm to Others

GDLS argues that, unlike the Club, it and others *will* suffer irreparable harm if the preliminary injunction is granted.

To begin, GDLS identifies harms both it, the Club's members, and others would suffer if Club members were permitted to be on the property while the munitions testing is occurring. (Doc. No. 14 at 29-30). The Club does not dispute that any or all of GDLS's concerns could occur under such circumstances. But the Club suggests those possible harms are eliminated if I not only grant them the ability to enter the property, but also enjoin GDLS from conducting such testing during this period. The Club offers no evidence, legal authority, or legal argument to suggest its 1918 interest could be enforced in such a manner.

Nevertheless, implicitly acknowledging that it would not assume those risks associated with simultaneous occupation if I were to grant injunctive relief, GDLS next contends it will not be able to conduct any of the tests required to fulfill its contractual obligations to the United States Army on its range from November 14, 2026 through December 18, 2026, costing it approximately $10,000 per day and jeopardizing the contract itself. (Doc. No. 14 at 30). To this, the Club asserts only that the harm to GDLS is minimal because "[t]he window now at issue contains 24 non-holiday weekdays," resulting in a "direct cost" of just $240,000. (Doc. No. 15 at 15).

Which is to say, the Club acknowledges that GDLS will be harmed if the preliminary injunction is granted. Thus, this factor weighs against granting the injunction.

### D. Broader Public interest

As for the final factor, the Club alleges, "[t]he public's interest in 'fair and carefully considered resolution of property rights disputes' should be paramount." (Doc. No. 15 at 15) (quoting *Back v. Faith Props.,* LLC, 2002-Ohio-6107, ¶ 35, 2002 WL 31502077, at *6 (Ohio Ct. App.

Nov. 12, 2002)). The Club contends this principle errs in favor of granting an injunction to maintain the status quo. (Doc. No. 6-1 at 21).

GDLS counters that an injunction that effectively bars the property owner of the ability to conduct its business on its property for nearly six weeks so that the holder of an easement can hunt on that property is against the public interest. (Doc. No. 14 at 30). Additionally, GDLS alleges the business it alleges it must conduct during hunting season legally must take precedence over the Club's hunting interest. (*Id.* at 31 (citing 50 U.S.C. § 4511(a); 15 C.F.R. § 700.11(a)(2))).

After considering both arguments, I conclude the public interest weighs against the injunction. I acknowledge the public may have a general interest in the status quo. But an injunction here would effectively prohibit the landowner from conducting its business operations for a six-week period so that, at most, eighteen Club members could hunt on 1,790 acres rather than 1,147 acres on non-holiday weekdays. The public would not favor this interference with the owner's property rights, particularly when the "business" at issue relates to the national security of a nation actively engaged in war. Accordingly, I conclude the public interest weighs against an injunction.

## IV. CONCLUSION

The Club is not likely to succeed on the merits or suffer irreparable harm in the absence of an injunction. But GDLS is likely to sustain damages if the injunction is granted. Further, the public interest weighs against granting the Club's requested preliminary injunction. Therefore, the motion for preliminary injunction is denied.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge